## Commonwealth *vs.* James Hollie.

No. 98-P-0160.

Suffolk. May 6, 1999. - August 5, 1999.

Present: Jacobs, Gillerman, & Greenberg, JJ.

*Robbery. Practice, Criminal,* Argument by prosecutor.

A criminal defendant was not deprived of a fair trial by the prosecutor's improper remarks in closing argument referring to the jury's duty and repeatedly referring to the blind victim's vulnerability, where the offensive portions of the summation were not related to the central issue of the reliability of the two identifying witnesses' testimony, but rather were confined to collateral issues and did not prejudice the defendant's case. [541-543]

Indictment found and returned in the Superior Court Department on June 27, 1996.

The case was tried before *Robert W. Banks*, J.

*Anne E. Gowen*, Committee for Public Counsel Services, for the defendant.

*Karen A. Palumbo*, Assistant District Attorney, for the Commonwealth.

Greenberg, J. The Suffolk County grand jury, on June 27, 1996, indicted James Hollie for unarmed robbery (G. L. c. 265, § 19[*b*]) and assault and battery (G. L. c. 265, § 13A). The case was tried to a jury on May 20-22, 1997. From a judgment of conviction upon a guilty verdict on the unarmed robbery charge, the defendant appeals.[1]

A jury could have seen the episode as follows. As he walked, with a white cane, into the foyer of the Back Bay Massachusetts Bay Transportation Authority (MBTA) station toward a set of inside doors, David Dillon, who is legally blind with only 20/200 vision in his right eye, was tackled by a "very muscular"

---

[1]The assault and battery conviction was placed on file, and is not presently before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975); *Commonwealth* v. *Ford*, 424 Mass. 709, 713 n.2 (1997).

robber. He was quickly relieved of his wallet. It was about 7:15 P.M. on May 24, 1996. He momentarily lost consciousness on the floor of the station. When he regained awareness, he spoke with two police officers and told them about his missing wallet and how to contact his spouse. The officers spoke with two percipient witnesses, who saw a man running from the scene of the attack immediately after the robbery.

As Maryann Fugger was approaching the Back Bay MBTA station at about 7:15 P.M. on May 24, 1996, she saw a large African-American man with a round face, clad in a gray tee shirt and black shorts, running in her direction, carrying a black bag which he held high over his head. Looking through the doors into the station, just behind this man, she saw Dillon falling backward to the floor. No one else, to her knowledge, was inside the station's foyer at that time.

Elizabeth Tomeo, at about the same time, was also headed toward the Back Bay MBTA station to catch a train. She also described to the police a heavy-set African-American man with a light-colored tee shirt and dark shorts, sprinting past her toward Clarendon Street. By the time she got inside the station's foyer, she saw Fugger leaning over Dillon trying to assist him.

After relaying the general description of the event and of the assailant to other police officers, the two officers, in separate police vehicles, set off to look for the robber, each officer accompanying one of the witnesses.

Another police officer, William Fredette, who was on patrol in his police car, heard a radio transmission report of the robbery. Soon thereafter, he spotted the defendant, who matched the general description of the robber, standing near the Boston Ballet building on Clarendon Street. The defendant was wearing dark shorts and a light-colored tee shirt. As Fredette began a check of the defendant's identification, Tomeo, and the officer with whom she was riding, pulled up in another police car. From that vantage point, Tomeo considered whether the defendant was the person she had seen running from the station. Ultimately, she concluded that he was. A short time later, Fugger arrived at the scene in another police car and also identified the defendant as the person she had seen running out of the Back Bay station.

Joseph Linnehan testified that on the night of the incident, he was the doorman at the Hard Rock Cafe in Boston. Sometime between 6:45 P.M. and 7:15 P.M. that evening, the defendant,

who was known to him as an employee of the Hard Rock Cafe, ran toward the Hard Rock Cafe from the direction of the Back Bay MBTA station, which was nearby. Linnehan opened the door for the defendant, who was perspiring heavily, and asked him why he was in such a hurry. The defendant said that he was late.

Stephanie Lill, the hostess at the Hard Rock Cafe, saw the defendant come inside and go directly into the men's bathroom, which was located on the lower level of the restaurant. Hans Beichel, the men's bathroom valet, saw the defendant on the stairs leading down to the bathroom, sweating profusely. Inside the men's room, Beichel saw the defendant "walking, . . . running around in circles" and then go inside the last toilet stall. The defendant came out of the stall in about one minute, and left the bathroom without washing his hands.

Sometime later on the same night, a uniformed police officer arrived at the Hard Rock Cafe and entered the last stall in the men's room, as directed by Beichel. There he found Dillon's wallet. Missing was the fifteen dollars which Dillon possessed before the robbery.

At trial, the main contested issue was the reliability of the testimony of the two women who saw the aftermath of the robbery at the station. Given the rapidity of the assault and the arrest, as well as Dillon's inability to identify him as the robber, the defendant suggests that the case against him was close. The defendant did not testify, but through cross-examination of his fellow employees, maintained that he came into the Hard Rock Café that day to check his work schedule and wash his hands.

At the beginning of his closing speech, the prosecutor emphasized that Dillon was a particularly vulnerable victim: "He's walking with his cane in the Back Bay T Station when the unthinkable happens. Does it get any worse than that? Does it get any worse than when this big tough guy over here comes up and tackles Mr. Dillon and takes his wallet from him and runs away. From a blind man with a cane . . . ."

The prosecutor laid stress on Dillon's disability, the brutality of the crime, and the difficulty that a witness in Dillon's position would have in testifying in court. The prosecutor implicitly suggested that Dillon would not subject himself to the ordeal of a trial unless it was very important for him to see the defendant brought to justice. There followed various commonplace arguments about the reliability of the government's eye witnesses.

The prosecutor concluded his closing speech to the jury with Polonius's exhortation to his son, Laertes: " 'This above all, to thine own self be true.'[2] I ask each and every one of you, ladies and gentlemen, to do the same. Return the only verdict in this case that truth dictates and justice demands, a verdict of guilty as to each indictment." The prosecutor's use of moral maxims added nothing to the case. The adjuration came just after he referred to the defendant's conduct as "unconscionable," "detestable," and "gutless." "Today, ladies and gentlemen, I'm asking each and every one of you to do something about it."[3]

A reference to the jury's "duty" when the argument suggests that if the jurors voted to acquit, they would not be doing their job as jurors, should be held to cross the line of permissible advocacy. See *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 287 (1987). See also *Commonwealth* v. *Smith*, 413 Mass. 275, 282 n.6 (1992); *Commonwealth* v. *Mello*, 420 Mass. 375, 379-381 (1995); *Commonwealth* v. *Andrade*, 422 Mass. 236, 244 n.9 (1996); *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 295 (1990). Can we say that such a discourse in the circumstances deprived the defendant of a fair trial, and as he argues, requires reversal of the convictions? This troubling problem turns, as always, on the particulars of the individual case. See *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. at 286-287.

A prosecutor "has a particular obligation . . . to argue the Commonwealth's case . . . in a way that states the evidence clearly and fairly and inspires confidence that the verdict was reached based on the evidence rather than sympathy for the victim." *Commonwealth* v. *Santiago*, 425 Mass. 491, 494 (1997). It was this point which the trial counsel raised by his objection at the conclusion of the prosecutor's argument. For his part, the judge did nothing to mitigate the wrong by giving any specific curative instruction to the jury.

"Remarks made during closing arguments are considered in

---

[2]Shakespeare, Hamlet, act I, sc. 3.

[3]Other than an objection registered at the end of the prosecutor's argument concerning the emotional appeal, trial counsel did not object to any of the specific remarks or ask for any instructions regarding these matters. We note, however, that trial counsel need not achieve perfection in identifying every impropriety or in offering an alternative so long as the objection alerts the judge to the grounds on which trial counsel objected to the prosecutor's closing argument. See *Commonwealth* v. *Person*, 400 Mass. 136, 138-143 (1987) ("objection at the conclusion of the prosecutor's argument is sufficient to preserve the defendant's rights").

the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993). The focus of the analysis in this case is whether the prosecutor's excesses were confined to "collateral issues or did [they] go to the heart of the case?" *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987) (citation omitted).[4] "It has not been held that reference to a jury's 'duty' calls for automatic reversal of a conviction." *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. at 287 n.6. Nor do repeated references to a victim's vulnerability, while improper, mandate reversal.

The offensive portions of the prosecutor's summation, which we have outlined, were, for the most part, not related to the central issue, i.e., the reliability of the two identifying witnesses' trial testimony. Although each witness may have seen the defendant's face for no more than a few seconds, each gave a strong identification of him within one-half hour of his apprehension. The lighting at the MBTA station was good, the witnesses both alert and attentive.

What distinguishes this case from *Commonwealth* v. *McLeod*, 30 Mass. App. Ct. 536 (1991), a case upon which the defendant relies, is the strength of the circumstantial evidence confirming the identification. In *McLeod*, the main issue at trial was whether the victim consented to sexual intercourse. *Id.* at 537. The issue was hotly contested and, therefore, the victim's credibility was at the core of the case. We reversed the defendant's conviction in *McLeod* because the prosecutor bolstered the victim's credibility and unfairly exploited the victim's expression of emotion by stating that it was a "tragedy" that "[the victim] had to take the witness stand, sobbing and hysterical, and [had] to explain her whole humiliation in public." *Id.* at 537 n.2.

In the instant case, the Commonwealth points out that the credibility of the victim was not crucial because he was unable to see his assailant's face. The identifying witnesses made their identifications at the show-up near the scene of the crime. Several other witnesses were able to corroborate the defendant's

---

[4]The other *Kozec* factors are as follows: (1) "[d]id the defendant seasonably object to the argument?" (2) "[w]hat did the judge tell the jury, generally or specifically," about the troublesome comments? and (3) "did the error in the circumstances possibly make a difference in the jury's conclusions?" 399 Mass. at 518.

somewhat frantic behavior in disposing of incriminating evidence at his work place near the MBTA station. Nothing in the challenged comments detracted from the strength of the Commonwealth's case. The bulk of the closing argument, as we read it, properly pertained to the central question, that is, the defendant's close proximity to the scene of the crime, and physical movements that inculpated him by exposing his agitated state to fellow workers just after he arrived at the Hard Rock Café.

We conclude that the defendant was not deprived of a fair trial. On the entire record, it cannot be said that the argument, to the extent that it evoked sympathy toward the victim because of the impact of the crime on him, produced the necessary prejudice under the standard set forth in the *Kozec* case. See *Commonwealth* v. *Thomas*, 400 Mass. 676, 683 (1987) (prosecutor's choice of terms to describe injuries inflicted upon the victim, to wit, brutalized, beaten, degraded, bruised, and humiliated, all were supported by the evidence and were inherent in the nature of the crime committed).

*Judgment affirmed.*