## COMMONWEALTH *vs.* MARK W. OBERSHAW.

Plymouth. December 7, 2001. - February 5, 2002.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Evidence,* Admissions and confessions, Photograph, Relevancy and material-
ity, Consciousness of guilt, Cross-examination. *Practice, Criminal,* Admis-
sions and confessions, Voluntariness of statement, Assistance of counsel,
Cross-examination by prosecutor, Comment by prosecutor, Argument by
prosecutor, Capital case. *Constitutional Law,* Admissions and confessions,
Waiver of constitutional rights, Assistance of counsel. *Waiver. Arrest.
Malice. Homicide.*

At a hearing on a motion by a criminal defendant to suppress his statements
to the police, the judge, in denying the defendant's motion to suppress,
properly concluded that the defendant never adequately and affirmatively
invoked his right to counsel, and that, since the questioning of the
defendant did not extend beyond six hours after his arrest, there was no
violation of the six-hour "safe harbor" rule governing questioning of ar-
restees prior to arraignment. [799-802]

At a murder trial, the judge did not abuse her discretion in admitting over
eighty photographs, including photographs of the crime scene, the victim's
body at a landfill, and the body at an autopsy, where the photographs either
supported the Commonwealth's theory of the events in question and
demonstrated that the defendant's version was implausible; were relevant
to extreme atrocity or cruelty; helped to explain the nature, type, and
number of injuries, and did not show the body in an altered state; or were
relevant to the defendant's consciousness of guilt; and where the judge
gave appropriate instructions to the jury to guard against the possibility
that they might be improperly influenced by the photographs. [802-804]

At a criminal trial, any impropriety in certain of the prosecutor's questions
during cross-examination was insubstantial given the fact that the objec-
tions to the remarks were sustained and in view of the overwhelming
evidence against the defendant. [804-805]

In the circumstances of a criminal trial in which the defendant objected to
several portions of the prosecutor's closing argument, claiming that the
prosecutor invited the jury to draw inferences unsupported by the evidence,
personally injected his own credibility and opinions, and improperly ap-
pealed to the sympathies and passions of the jury, the prosecutor's closing
argument was not improper. [805-808]

At a murder trial, the judge's instructions to the jury did not create a manda-
tory presumption of malice from the use of a dangerous weapon, where the
jury were told that they were "permitted to infer," not that they must infer.
[808-809].

At a murder trial, the judge did not err in refusing to charge the jury that a
unanimous verdict must be reached with respect to the factors expressed in
*Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), that must be
considered in determining a verdict based on the theory of extreme atrocity
or cruelty, where such factors were evidentiary considerations, not ele-
ments of the crime or separate theories of culpability. [809]

INDICTMENT found and returned in the Superior Court Depart-
ment on September 2, 1997.

A pretrial motion to suppress evidence was heard by *Linda E.
Giles*, J., and the case was tried before her.

*Donald A. Harwood*, of New York, for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the
Commonwealth.

COWIN, J. The defendant, Mark W. Obershaw, was convicted
of murder in the first degree on a theory of extreme atrocity or
cruelty. On appeal, he claims that (1) his motion to suppress his
statements to the police should have been allowed because (a)
the police did not honor his request for counsel; and (b) the
statements were made more than six hours after his arrest, in
violation of the "safe harbor" rule, see *Commonwealth* v. *Rosa-
rio*, 422 Mass. 48, 56 (1996)[1]; (2) the trial judge (who was also
the motion judge) abused her discretion in admitting nearly
ninety photographs of the victim's body; (3) the prosecutor
unfairly asked the defendant certain prejudicial questions; (4)
the prosecutor's closing argument was improper; (5) the judge's
instruction on malice aforethought as it pertains to premeditated
murder was erroneous and unconstitutionally shifted the burden
of proof to the defendant; (6) the judge erred by refusing to
charge that a unanimous verdict is required in regard to the
*Cunneen* factors, see *Commonwealth* v. *Cunneen*, 389 Mass.
216, 227 (1983), the jury deemed sufficient for a determination
of murder by extreme atrocity or cruelty; and (7) we should
exercise our extraordinary power to set aside the verdict or
reduce it to a lesser degree of guilt. We affirm the conviction
and decline to exercise our power under G. L. c. 278, § 33E.

---

[1]An otherwise admissible statement made to the police is not to be excluded
because of unreasonable delay in arraignment, if the statement is made within
six hours of the arrest. *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996).

1. *Facts*. We recite in general outline the facts the jury could have found, reserving details for discussion in conjunction with specific issues raised. The defendant, unhappy that his brother, Brian, no longer would permit him to stay at his Rockland condominium unit, killed Brian by hitting him over the head repeatedly with a steel automobile steering wheel locking device known as the Club. The defendant then attempted to cover up his actions by cleaning the blood from Brian's apartment and placing Brian's body and other bloody items in his car trunk. He discarded his clothing and the murder weapon en route to burying Brian's body in a landfill in Bedford. The defendant was discovered by the police several hours later sleeping in his car behind the Nahant police station. The defendant spoke with the police numerous times, eventually confessing to the gruesome crime and leading the police to the site where he had buried his brother's body.

2. *Motion to suppress*. The defendant maintains that the judge erred in denying his motion to suppress his statements to the police because the evidence at the suppression hearing did not support the finding that his statements were made after a knowing and voluntary waiver of the Miranda warnings, see *Miranda v. Arizona*, 384 U.S. 436 (1966), given that (a) he had invoked his right to an attorney, see *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), and *Commonwealth v. Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980); and (b) the incriminating statements were elicited by the police more than six hours after his arrest in violation of the "safe harbor" rule of *Commonwealth v. Rosario, supra* at 57-58.

We summarize the relevant facts as found by the motion judge, supplemented by uncontested testimony from the motion hearing. On Friday, July 25, 1997, at 8:45 P.M., the State police were called to a two-story townhouse in Rockland, owned by the victim. The defendant had lived in the townhouse until his gambling problem caused friction between the two brothers. The victim had packed the defendant's belongings in advance of asking the defendant, who had recently been traveling, to move out.

On inspecting the scene, Trooper Joseph Mason found blood splatterings leading to the second floor. There was a large

amount of blood in the bathroom, although someone had attempted to clean the area. A portion of the carpet on the stairs was torn away; the bathroom smelled of disinfectant; and a shower curtain, window shade, and curtain were missing.

A neighbor told the trooper that, at about 6 A.M. that morning, he had noticed a tan-colored Nissan automobile with Florida registration plates pull into the driveway. When it was determined that the defendant drove such an automobile, the police issued a broadcast describing the vehicle.

At approximately 3 A.M., a Nahant police officer noticed the defendant as he attempted to sleep by the side of the road in his parked automobile with his two dogs. The officer informed the defendant that he could not sleep on the street, but suggested a nearby parking lot behind several municipal buildings, including the police station. The defendant moved his vehicle to the suggested location. When a check of the defendant's registration plate revealed that the defendant was wanted for questioning in connection with a homicide, the State police were contacted. The State police ordered the vehicle secured until their arrival, whereupon cruisers cordoned off the exits from the parking lot. However, there is no evidence that the defendant was aware of this police action.

Trooper Mason arrived at the parking lot and found the defendant asleep in his automobile. The defendant was asked to get out of the car, was advised of his Miranda rights, and was informed that the police were searching for his brother. The defendant asked what was wrong and said he did not know where his brother was. He stated many times that he loved his brother, agreed to accompany the police to the station, and offered to "voluntarily stay and cooperate" in the search.

The police informed the defendant several times that he was free to leave. They permitted him to spend a significant amount of time alone with his dogs. The defendant continued to volunteer to stay to help the investigation, and consented orally and in writing to a search of his vehicle, his trunk, and a suitcase inside the car. He also agreed to submit to a swabbing of his hands for blood and fingerprints. During this time, he appeared sober and coherent, and he seemed to understand what was said to him.

After the defendant signed a written waiver of his Miranda rights, Trooper Mason and a detective engaged him in a conversation about his whereabouts on the previous day. The defendant informed the police that he had arrived at his brother's house from Atlantic City at about 6 A.M., and that he entered the house with his own key and did not speak to or see his brother while he was at the townhouse. He volunteered to submit to a polygraph test and cooperate fully. After this conversation, the defendant remained at the police station while the police inspected his car, although he was informed once more that he was free to leave. He spent the next few hours behind the station playing with his dogs. He was sometimes as far as several hundred feet from the station and was not accompanied by a police escort or restrained in any way.

Based on the defendant's consent, the police proceeded to search his vehicle. Stains found in the trunk tested positive for traces of blood. The police then sought a search warrant for the automobile. At this point, the defendant indicated that he wanted to talk. He began to cry and stated, "I love my brother. It was my fault. I'm sorry. I hit him." After making this statement, the defendant was no longer free to go, and the police for the first time considered him to be in custody, although he was not handcuffed. He requested ten or fifteen minutes, which he was allowed. The police then inquired whether he would lead them to the body, but the defendant asked if he could talk to a lawyer first. The police told the defendant that he could use the telephone to call a lawyer, but the defendant declined, and asked instead to go "outside to [his] dogs." The defendant was permitted time with his dogs, although now he was under guard. A short time later, the defendant refused a second offer by the police to use the telephone. He stated to one of the officers watching him, "You know this wasn't premeditated. I didn't plan it," and expressed his appreciation for the "good and fair" way that the police had treated him.

When asked where the body was located, the defendant said that he would lead the police to a compost company in Bedford, where he had disposed of the body. At this point, the defendant admitted that he gained access to the townhouse using a copy of the key he had made a few weeks earlier without his brother's

permission, and that his brother had become upset that the defendant was in his home and began pushing the defendant out of the house. His brother "took a swing" at him and hit him in the head. In response, the defendant picked up the Club and hit his brother with it. The defendant chased his brother up the stairs and continued to hit him with the Club.

The police took the defendant to the Bedford landfill, where he directed the officers to the body. The defendant was advised of his Miranda rights a third time. On the way back to the station, the defendant revealed that he had disposed of the Club by throwing it along Route 93, and that he had disposed of other incriminating items in a dumpster behind Chelmsford High School. He also provided more details about the previous day's incident, stating that his brother's strike to his head had hurt him emotionally but not physically, and that, after beating his brother, he left the house but returned to clean it and dispose of the body.

The defendant claims that his constitutional rights were violated because the police did not honor his request for counsel, but continued to question him after such request. He further maintains that his incriminating statements to the police should be suppressed because they were made more than six hours "after his arrest at approximately 4 A.M. earlier that same day," in violation of the six-hour "safe harbor" rule. See *Commonwealth* v. *Rosario*, 422 Mass. 48, 57-58 (1996).

The judge found that the defendant "never adequately and affirmatively invoked his right to counsel"; that the defendant was not under arrest until 11:25 A.M.; and that the questioning of the defendant did not extend beyond six hours after his arrest. Thus, even though the police first encountered the defendant at 4 A.M., the judge determined there was no violation of the six-hour "safe harbor" rule governing questioning of arrestees prior to arraignment. She ruled that the defendant validly waived his Miranda rights and denied his motion to suppress. .

On review of a motion to suppress, we do not disturb the judge's subsidiary findings of fact unless they are clearly erroneous and we give substantial deference to the judge's ultimate findings and legal conclusions, but we independently review the correctness of the judge's application of constitutional

principles to the facts found. See *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). The judge's findings are adequately supported by the record and she correctly applied the law to the facts.

It is the Commonwealth's burden to establish the validity of a Miranda waiver beyond a reasonable doubt. See *Commonwealth* v. *Magee*, 423 Mass. 381, 386 (1996). Such a waiver must be made voluntarily, knowingly, and intelligently. *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). The law is clear that an individual may assert his right to counsel and terminate police questioning at any time prior to or during an interview, even after waiving that right. If a person states that he wants an attorney, any interrogation must cease until an attorney is present. *Miranda* v. *Arizona,* *supra* at 474. A defendant's decision to terminate questioning must be scrupulously honored. *Commonwealth* v. *Brant*, 380 Mass. 876, 882 (1980). However, "[f]or the rule of Miranda . . . to apply, there must be either an expressed unwillingness to continue or an affirmative request for an attorney." *Commonwealth* v. *Selby*, 420 Mass. 656, 662 (1995), quoting *Commonwealth* v. *Roberts*, 407 Mass. 731, 734 (1990). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis* v. *United States*, 512 U.S. 452, 461-462 (1994).

As the judge found, the defendant's question whether he could speak to a lawyer before taking the police to his brother's body was not an affirmative request for an attorney. We have repeatedly held that equivocal statements and musings concerning the need for an attorney do not constitute such an affirmative request. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 658 (2000) ("defendant's musing about whether he wanted to continue speaking with the police in the absence of an attorney was sufficiently ambiguous so as not to constitute an invocation of his right to counsel or his right to remain silent"). See also *Commonwealth* v. *Hussey (No. 1)*, 410 Mass. 664, 672, cert. denied, 502 U.S. 988 (1991) (no affirmative request for attorney where "after the defendant attempted unsuccessfully in the presence of the police to reach his attorney, the defendant pushed aside a telephone book . . . proffered to him and,

without police pressure, subtle or otherwise, said, 'I'm not going to wait. All right. I'll tell you what happened' "); *Commonwealth* v. *Todd*, 408 Mass. 724, 726 (1990) (same, where defendant "wondered aloud about the advisability of having a lawyer"); *Commonwealth* v. *Corriveau*, 396 Mass. 319, 331 (1985) (no affirmative request to speak with attorney when defendant stated, "It's beginning to sound like I need a lawyer," police responded, "You may use the telephone to call a lawyer and you may leave at any time if you wish to do so," and defendant replied, "I don't want to leave and I don't want a lawyer"); *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984) (defendant's comment, "I guess I'll have to have a lawyer for this," was acknowledgment of seriousness of charges against him, not affirmative request for attorney).

Here, when the defendant was asked if he would take the police to his brother's body, he asked, "Can I talk to a lawyer first?" He was told to use the telephone, but he declined, saying that he did not want to telephone a lawyer, but wanted to go outside and spend some time with his dogs. The defendant was permitted to do so. He later approached Lieutenant Michael Crisp outside the station and initiated a conversation. The officer, aware of the defendant's statement regarding an attorney, told him that if he wanted a lawyer, he could use the telephone because further conversation was not permissible in such circumstances. The defendant declined again. See *Davis* v. *United States*, *supra* at 461 (recommending as "good police practice" that officers clarify ambiguous or equivocal statements). The defendant spent about another one-half hour with his dogs and subsequently revealed to Trooper Mason where his brother was buried. These facts support the judge's conclusion that the defendant never affirmatively requested an attorney.

The judge also properly concluded that there had been no violation of the "safe harbor" rule: "[W]ith respect to police questioning of an arrested person . . . [a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night) . . . ." *Commonwealth* v. *Rosario*, *supra* at 56. A six-hour safe harbor protection is only ap-

plicable once a defendant is arrested. Thus, the key is "whether there was 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Commonwealth* v. *Morse,* 427 Mass. 117, 126 (1998), quoting *United States* v. *Ventura,* 85 F.3d 708, 710 (1st Cir. 1996). An arrest occurs where there is "[1] 'an actual or constructive seizure or detention of the person [2] performed with the intention to effect an arrest and [3] so understood by the person detained.' " *Commonwealth* v. *Cook,* 419 Mass. 192, 198 (1994), quoting *Massachusetts Gen. Hosp.* v. *Revere,* 385 Mass. 772, 778 (1982), rev'd on other grounds, 463 U.S. 239 (1983). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Commonwealth* v. *Morse, supra* at 124, quoting *Stansbury* v. *California,* 511 U.S. 318, 323 (1994).

The judge's finding that the defendant was not arrested until 11:25 A.M. is supported by the evidence. A State trooper (who was not at Nahant) had ordered the defendant's car secured and the exits to the police station parking area where the defendant's car was located cordoned off. Nevertheless, as the judge found, "[t]here was no evidence that the defendant was aware of this temporary blockade." Although the defendant was at the police station and spoke with the police intermittently between 4 A.M. and 11:25 A.M., he was repeatedly informed that he was free to leave; he volunteered to remain to help the police in their investigation. The fact that the defendant's car was seized at one point later in the morning (for chemical testing) did not restrict his freedom of movement. The defendant was permitted to walk outside with his dogs at various times in the morning, sometimes at some distance with no guard; he was not handcuffed or restrained in any way. Cf. *Commonwealth* v. *Borges,* 395 Mass. 788, 791 (1985) (police request that defendant remove shoes constitutes seizure).[2]

3. *Photographs.* The defendant claims prejudice from the

---

[2]Although the test is an objective one, the defendant himself did not believe that he was under arrest during the time in question. At 11 A.M., when blood was found in his car, he asked for the first time whether he was under arrest and what would happen to his dogs if he were arrested.

admission in evidence of "so many" ("up to ninety") photographs, arguing that the sheer number of photographs combined with the gruesome nature of some of them rendered them prejudicial and unnecessary. The judge admitted over eighty photographs: most were of the crime scene, the body at the landfill, and the body during the autopsy. Several photographic enlargements were also admitted. "The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). See *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 362-363 (2000). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury.' " *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976). See *Commonwealth* v. *Benson*, 419 Mass. 114, 118 (1994) (same).

The defendant contested the Commonwealth's account of how the murder took place. At trial, he testified that it was his brother who picked up the Club and chased him upstairs, that he wrestled with his brother for possession of the Club, and that he hit his brother only once with the Club and then blacked out after his head hit the wall. The Commonwealth was entitled to place before the jury the pictures of the crime scene and those depicting the victim's bruised body to support its theory of the events in question and demonstrate that the defendant's version was implausible. The photographs of the victim's body taken at the scene and during the autopsy were also relevant to extreme atrocity or cruelty. *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984). The victim received at least ten blows to the head and did not die immediately from the first blow. He tried to defend himself with his hands and received blows to both his hands. The autopsy photographs helped to explain the nature, type, and number of injuries. "[A] photograph that suggests the degree of force applied by an assailant and portrays the injuries inflicted is properly admissible for that purpose." *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 431 (2001). None of

the photographs taken in the autopsy room showed the body in an altered state. Cf. *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). There was also no error in the admission of the photographs taken at the landfill. These photographs were relevant to the defendant's consciousness of guilt: they demonstrated that the defendant had tried to cover the body with several feet of debris. The fact that some of these photographs might have been duplicative did not mandate their exclusion.[3] *Commonwealth* v. *Simmons*, 419 Mass. 426, 431 (1995). The judge also appropriately cautioned the jury to guard against the possibility that they might be improperly influenced by the photographs.[4]

4. *Cross-examination of the defendant.* The defendant maintains that some of the prosecutor's questions during cross-examination were improper, thus violating his right to a fair trial. The questions at issue were objected to at trial. In each instance the objections were sustained or the judge instructed the prosecutor to "[m]ove on." Accordingly, these questions were unanswered and thus placed nothing before the jury. See *Commonwealth* v. *Sullivan*, ante 722, 732 (2002). Further, the judge instructed that "[a] question put to a witness is never evidence, only the answers are evidence." Despite our conclusion that the questions placed nothing before the jury, some of the objectionable material was in the nature of speeches and never contained a question before trial counsel interrupted with an objection. Such lengthy recitations of the evidence without any question are not proper. Given the fact that the objections

---

[3]We determine there is no error in these circumstances. Ordinarily this quantity of photographic evidence should not be admitted, however, as it is likely to be cumulative and may have unanticipated effects on the jury.

[4]The judge instructed the jury that they were "not to be influenced in any way by the unpleasant even gruesome nature of some of these photographs. . . . [The defendant] is entitled to a verdict based solely on the evidence presented in this case and not from any pity that may be occasioned by . . . the perhaps gruesome nàture of these pictures. So, I want to emphasize that again to you. I want you to view these exhibits . . . only as they may draw attention to an alleged medical status that may be testified to or to the nature and extent of the alleged victim's injuries. So, once again . . . I want to caution you, you are not to be influenced in any way by the nature or content of some of these pictures that you are about to be shown." Similar instructions were repeated at other points during the trial, including the judge's final instructions.

to these remarks were sustained, and in view of the overwhelming evidence against the defendant, we consider that the impropriety was "insubstantial." *Commonwealth* v. *Arce*, 426 Mass. 601, 603 (1998).

5. *Closing argument.* The defendant objects to several portions of the prosecutor's closing argument, claiming that the prosecutor invited the jury to draw inferences unsupported by the evidence; in others, the prosecutor "personally injected his own credibility and opinions"; and, in another, the prosecutor improperly appealed to the "sympathies and passions" of the jury.

As an initial matter, we determine whether these issues were preserved for appeal. At the close of the arguments, defense counsel objected to some of the statements, but indicated that he wanted "to put [the objections] on the record, whether you want to take any moment [*sic*] on them or not I'll leave to you." The judge overruled the objections, but offered to instruct the jury that closing arguments are not evidence. Defense counsel declined, and the judge waited until her final instructions to so inform the jury. Although not dispositive of the issue, the refusal of the judge's offer by counsel "is some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 359-360 (1985). Nevertheless, we consider that the defendant preserved the issues for review, as he specifically objected after the summation, see *Commonwealth* v. *Person*, 400 Mass. 136, 139 (1987) (objection at conclusion of prosecutor's argument sufficient to preserve defendant's rights); *Commonwealth* v. *Hollie*, 47 Mass. App. Ct. 538, 541 n.3 (1999) (perfection not necessary as long as judge alerted to ground for objection). We review the remarks to determine whether there were improprieties, and if so, whether they were harmless. *Chapman* v. *California*, 386 U.S. 18, 24 (1967). *Commonwealth* v. *Dougan*, 377 Mass. 303, 312 (1979).

The defendant points to several portions of the closing as lacking support in the evidence. He criticizes the prosecutor's statement that the victim was struck with "ten blows." The medical examiner testified that "at least ten blows" were struck.

Although the defendant contends that the prosecutor improperly argued that the gouge marks in the bathroom were caused by the defendant repeatedly swinging the Club, the record contradicts him. The judge excluded expert opinion from a "blood splatter" expert concerning whether the Club was the source of the gouge marks in the bathroom wall, but she specifically stated that the prosecutor could argue the inference from the photographic evidence that the Club caused the gouge marks.

The defendant maintains that the prosecutor improperly argued that the victim was alive throughout the "entire beating." The defendant's argument ignores his own testimony at trial that the victim died in his arms after the beating. This argument also ignores the Commonwealth's expert evidence that the victim was alive throughout the beating. The medical examiner testified that the victim was alive for at least several minutes after the beating began and did not die immediately, and that he had defensive wounds to his arms and hands and extensive swelling and bleeding in his brain that required time to develop. The medical examiner also stated that the victim had large purple-blue bruises on his ankles, sustained while he was alive; the defendant testified at trial that he had dragged the victim by the ankles down the stairs, through the house, and into the garage. It is a reasonable inference that these ankle injuries occurred at that time, at the end of the beating, with the victim still breathing. Thus, the argument that the victim was alive during the entire beating was a reasonable inference.

The defendant argues that it was improper for the prosecutor to state that the victim begged the defendant to stop the beating. Although the Commonwealth argues that this remark "is a fair and common-sense inference because anyone in [the victim's] situation would be begging his attacker to stop," no evidence supports such an inference. The fact that the victim threatened to telephone the police, fled from the defendant, or attempted to defend himself does not justify an inference that he "died begging his brother to stop." However, "[r]emarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." *Commonwealth* v. *Viriyahiranpaiboon,*

412 Mass. 224, 231 (1992). Improper remarks by a prosecutor in closing must be considered on a case-by-case basis. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987). The suggestion by the prosecutor that the victim begged for his life was not central to the case. *Id.* Moreover, the judge instructed the jury that the closing arguments of counsel were not evidence. Given the strength of the Commonwealth's case, it is unlikely that the defendant was unfairly prejudiced by this improper reference.

The defendant further argues that the prosecutor improperly injected his own opinion of the defendant's credibility by calling the defendant a liar. There was substantial evidence that the defendant had changed his story between his statements to the police and his testimony at trial and that his account at trial strained credulity. The prosecutor quite properly pointed out the discrepancies in the defendant's versions of the events surrounding the victim's death. To the police the defendant said he had killed his brother and explained that he had chased the victim up the stairs of the townhouse and hit his skull several times with the Club. In contrast, the defendant testified at trial that the victim chased him upstairs; he hit the victim once with the Club, he fell, hit his head, blacked out and could remember nothing more until he woke up and found his brother bleeding; he then held his brother in his arms as he expired. The defendant's testimony was contrary to the physical evidence and the medical examiner's testimony. Thus, the prosecutor's argument was fair comment based on the evidence that the defendant's story was inherently unbelievable and implausible. It was not an expression of his personal opinion regarding the defendant's credibility. See *Commonwealth* v. *Oliveira*, 431 Mass. 609, 613 (2000) (remarks contesting credibility of defendant's testimony "had a basis in the evidence and were not the prosecutor's personal comments on the credibility of the defendant"); *Commonwealth* v. *Toro, supra* at 359 (on evidence, not improper to argue defendant was cocaine dealer or defense witnesses were liars). Cf. *Commonwealth* v. *Kosilek*, 423 Mass. 449, 459 (1996) (probably improper to call defendant "liar" and state that he had constructed "cunning charade" to mislead police). The prosecutor did perhaps repeat the liar refrain more

than was necessary, but the suggestion that the defendant was a liar found ample support in the evidence. The prosecutor's statement that the testimony of the defendant was an insult to the jury was no more than a "rhetorical flourish," undoubtedly recognizable to the jury as such. *Commonwealth* v. *Hamilton*, 426 Mass. 67, 75 (1997).

The defendant further alleges that the prosecutor stated his personal opinion that the defendant was indifferent to the victim's suffering when he commented: "Was he indifferent to his brother's suffering, Number 1? You bet he was. Look at what he did: backed him into a corner and beat him as he lay there defenseless. He showed him no mercy, he was indifferent to [the victim's] suffering. . . ." This statement was part of a list of the reasons why the jury should conclude that the murder had been committed with extreme atrocity or cruelty. It was not a statement of personal opinion. The defendant's primary objection here seems to be to the phrase, "You bet he was." The expression is nothing more than a colloquial way of emphasizing the defendant's indifference.

The defendant's last argument regarding the closing is that the prosecutor "improperly appealed to the sympathies and passions of the jury." This objection was not made to the judge; we review to determine whether there has been any error that creates a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Degro*, 432 Mass. 319, 326 (2000). The prosecutor said, "Now, I'm going to be honest with you, ladies and gentlemen, I don't really give a crap what he went through. I'm here to tell you what [the victim] went through . . . ." The argument, rather than one that plays to the emotions and sympathies of the jury, was one that interjected the prosecutor's personal opinion, and, as the Commonwealth conceded, was improper. It is of no moment what the prosecutor considered regarding the defendant's plight. Nevertheless, in almost twenty-five transcript pages of closing argument, this statement of the prosecutor's personal opinion could not have created a substantial likelihood of a miscarriage of justice.

6. *Malice instruction.* The defendant contends that the judge improperly instructed that the jury are "permitted to infer that a person who intentionally uses a dangerous weapon on another

person is acting with malice." He claims that this created a mandatory presumption of malice from the use of a dangerous weapon. The jury were told that they were "permitted to infer," not that they must infer. This instruction (now contained in the Model Jury Instructions on Homicide 61 [1999]) was proper.

7. *Extreme atrocity or cruelty.* The defendant next maintains that the judge erred by refusing to charge the jury that a unanimous verdict must be reached with respect to the *Cunneen* factors, see *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983), that must be considered in determining a verdict based on the theory of extreme atrocity or cruelty. We have previously rejected this argument, see *Commonwealth* v. *Hunter,* 427 Mass. 651, 656-658 (1998), and repeat that these factors are "evidentiary considerations," not elements of the crime or separate theories of culpability.

The decision of the United States Supreme Court in *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000), is of no assistance to the defendant. In the *Apprendi* case, the Supreme Court held that a State hate crime statute, which authorized an increase in the maximum prison sentence based on a judge's finding that the defendant acted with the purpose to intimidate because of, inter alia, race, violated the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 476. The Court concluded that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Here, because it is evidence, not an element, that is involved, the *Apprendi* case is inapplicable. The *Apprendi* decision does not require that there be unanimity on every evidentiary factor supporting an element of a crime.[5,6]

---

[5]The defendant also seeks support from *Richardson* v. *United States,* 526 U.S. 813 (1999). There, however, the Court recognized that a jury, in deciding whether the elements of a crime are met, need not "decide unanimously which of several possible sets of underlying brute facts make up a particular element." *Id.* at 817. Because the *Cunneen* factors are "evidentiary considerations" that guide a jury in determining whether a murder was committed with extreme atrocity or cruelty, they do not constitute essential elements requiring unanimity. *Commonwealth* v. *Cunneen,* 389 Mass. 216, 227 (1983). *Commonwealth* v. *Hunter,* 426 Mass. 651, 657-658 (1998).

[6]The Commonwealth requests that we reconsider our requirement that the

8. *General Laws c. 278, § 33E.* We have reviewed the entire record, the briefs, and the arguments of counsel. We see no reason to exercise our power under G. L. c. 278, § 33E, to set aside the verdict or reduce it to a lesser degree of guilt.

*Judgment affirmed.*

---

jury be limited to the *Cunneen* factors when considering a theory of extreme atrocity or cruelty. We see no reason to do so.