**UNITED STATES of America,**
**Appellee,**

v.

**Rafael PAGÁN–SANTINI,**
**Defendant, Appellant.**

No. 03–2574.

United States Court of Appeals,
First Circuit.

Heard March 6, 2006.

Decided June 14, 2006.

Bruce J. McGiverin, for defendant, appellant.

Armando O. Bonilla, Public Integrity Section, Criminal Division, Department of Justice, with whom Noel L. Hillman, Chief, Public Integrity Section, Criminal Division, Department of Justice, and Mary K. Butler, Public Integrity Section, Criminal Division, Department of Justice, were on brief for appellee.

Before BOUDIN, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

BOUDIN, Chief Judge.

Rafael Pagán Santini ("Pagán") was indicted in the district court in Puerto Rico for obstruction of justice, 18 U.S.C. § 1503(a) (2000), perjury, *id.* § 1623(a), subornation of perjury, *id.* § 1622, and conspiracy to do the above, *id.* § 371. After a lengthy jury trial in May and June 2003, he was found guilty on all counts and sentenced to 18 months in prison. Now before us is an appeal from that conviction.

Pagán's own trial followed another trial that is background to the present case. In the late 1990s, while Pagán was serving as executive director of the Puerto Rico Community Network for Clinical Research on AIDS, authorities were investigating the apparent embezzlement of over $1 million in federal funds from another organization, the San Juan AIDS Institute.

The prime target of the investigation was Yamil Kourí–Pérez, a doctor who at the time worked for the Harvard Institute for International Development. The Harvard entity had a contract with a company called Advanced Community Health Services ("ACHS"), which in turn had been hired to run the San Juan AIDS Institute from the late 1980s until 1994. In 1997, a federal grand jury indicted Kourí and others in connection with the suspected embezzlement.

After learning of the investigation, Kourí and his co-conspirators hatched a scheme to draft and back-date fraudulent contracts to demonstrate (falsely) that the allegedly embezzled funds had been legitimately paid—in particular, to a Mexican entity called Fundacion Panamericana in return for AIDS educational materials. According to the government, several people who were not originally involved in the embezzlement scheme, including Pagán, helped Kourí in his efforts to conceal his crime. Kourí's attempted coverup was thwarted when, in mid-trial, a key defense witness, Gloria Ornelas, suddenly refused to continue her testimony and, to avoid prosecution, returned to court to testify against Kourí. Kourí was convicted and began cooperating with the government.

At Pagán's trial, Kourí and others testified as to Pagán's involvement in the conspiracy to obstruct Kourí's trial and to elicit perjured testimony. If believed, the testimony allowed a jury to conclude that Kourí had enlisted Pagán in a scheme to secure Kourí's acquittal; that Pagán had received financial and other benefits in return; and that Pagán knowingly assisted in the fabrication of cover stories to refute embezzlement charges against Kourí, testified falsely in support of such cover stories at Kourí's trial, and sought to persuade or assist other witnesses to testify falsely in defense of Kourí.

Specifically, the government offered evidence that Pagán had solicited Ornelas to

resume her false testimony in Kourí's trial after she faltered. When she refused, Pagán then had assisted in preparing a replacement witness—Hector Ramírez Lugo ("Ramírez"), a Mexican doctor, who testified falsely at Kourí's trial that he had worked for Ornelas at Panamericana and that Panamericana had done legitimate AIDS-related work for ACHS in return for the funds that the government claimed Kourí had misappropriated.

On Pagán's appeal from his own conviction, he does not contest the sufficiency of the evidence against him, save on one of the four counts (his conviction for committing perjury). Most of Pagán's claims of trial error concern evidentiary rulings and instructions. He also requested resentencing, although he withdrew that request as moot in his reply brief.[1] The standard of review varies depending upon the type of error alleged.

Pagán's first claim is that the district judge erred in refusing to suppress admissions made by Pagán on February 13, 2002, at a meeting with FBI agents and federal prosecutors in Puerto Rico. For this meeting, Pagán traveled from Mexico to San Juan after being assured, in a letter by prosecutors to Pagán's father, that "we have not sought or obtained a criminal indictment against [Pagán], and we will not arrest him next week if he travels to Puerto Rico to meet with us."

During the meeting, Pagán made statements that were used against him during the trial on all four counts—statements especially damaging to his defense against the perjury charge. For example, according to FBI agent testimony, Pagán admitted that in April 1999 he had seen certain contracts (which turned out to have been back-dated) between the San Juan AIDS Institute and Panamericana (contrary to his May 1999 testimony at the Kourí trial that he had never before seen the contracts); admitted that certain portions of his testimony at Kourí's trial had been false; and admitted that he testified in favor of Kourí because he believed he would benefit from his association with Kourí.

■ The district judge refused to suppress the admissions on any of the grounds asserted by Pagán, which were primarily that the admissions were secured by false assurances by the government, without a *Miranda* warning, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by coercion and (finally) by interference with Pagán's right to counsel. We review *de novo* the district court's legal conclusions on the motion to suppress and its factual findings for clear error. *See, e.g., United States v. Leon–Delfis*, 203 F.3d 103, 107 (1st Cir. 2000).

■ There were no false assurances. Pagán was not arrested during his trip and, according to uncontradicted government witnesses at the suppression hearing, at that time the government had not yet decided whether to seek to indict Pagán. That the government might have been building a case against Pagán should have been obvious to him—that is surely why he asked about possible arrest—but, obvious or not, the government under these circumstances had no affirmative obligation to warn him that he was a possible target. *See, e.g., United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).

---

1. The government cross-appealed to object to the refusal of the district court to apply a particular sentence enhancement sought by the government, but has since withdrawn and voluntarily dismissed its cross-appeal.

■ As for Pagán's *Miranda* claim, no *Miranda* warning was required because Pagán was not "in custody." *Miranda*, 384 U.S. at 477–78, 86 S.Ct. 1602; *McCown v. Callahan*, 726 F.2d 1, 5 (1st Cir.), *cert. denied*, 469 U.S. 839, 105 S.Ct. 139, 83 L.Ed.2d 78 (1984). The test is whether a reasonable person would believe he is "in custody" under the circumstances. *United States v. Fernandez Ventura*, 85 F.3d 708, 711 (1st Cir.1996). Although the interview with Pagán lasted nine hours, he rejected breaks or a deferral of some questioning to a second day (because he wanted to complete the interview that day).

■ The district court did not believe Pagán's claims that he had been barred from leaving the meeting or verbally abused, permissibly crediting FBI testimony to the contrary. That Pagán was not allowed to wander through the FBI premises except under escort is no surprise; it is unlikely that a federal judge would fare any better. Finally, even if Pagán was at the time of the interview a target of the government investigation—a point the government witnesses disputed—that alone would not entitle him to *Miranda* warnings. *See United States v. Quinn*, 815 F.2d 153, 160 (1st Cir.1987).

■ Pagán also claimed that the government violated his Sixth Amendment right to counsel. But even if we by-pass *Davis v. United States*, 512 U.S. 452, 456–57, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (right attaches upon "the initiation of adversary criminal proceedings"), the trial court supportably found that Pagán never asked to confer with or have present any lawyer. Pagán argues that his father (an attorney) asked to speak with him while he was being interviewed; what occurred was disputed but it is sufficient that (as the district court found) Pagán *himself* made no request for counsel. *Moran v. Bur-*

*bine*, 475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

■ Somewhat more troubling is Pagán's next claim of error. Over his objection, the court permitted the prosecutor to offer testimony at trial that during the preparation for the Kourí trial Pagán had gotten drunk and on multiple occasions sexually harassed Ramírez, whom Pagán was preparing as a witness for Kourí. The evidence included relatively terse testimony by Ramírez that Pagán had sought to kiss him, had sought to touch him and had masturbated in front of him.

Pagán first argues, as he did in the district court, that the testimony was irrelevant, save solely for the inference that Pagán had a bad character—a purpose for which the evidence would not be allowed. Fed.R.Evid. 404(b). But the testimony was relevant: it explained certain interactions between Pagán, Ramírez and Kourí during the period in which Pagán was seeking to coach Ramírez and thereby made more plausible the government's depiction of Pagán's role and his importance to Kourí's scheme.

Merely as an example, the evidence showed that Ramírez, who was initially lodged with Pagán, left after the harassment and had to be persuaded by Kourí to stay elsewhere and to confer with Pagán at a neutral location. Thus, the harassment explained Ramírez' decision to move out while his continued meetings with Pagán elsewhere, brokered by Kourí, showed how important to the conspiracy was Pagán's continued involvement as the best available coach with the detailed knowledge to get Ramírez prepared.

■ Although the harassment testimony was at least marginally relevant, the district court has overriding authority under Fed.R.Evid. 403 to exclude evidence whose prejudicial effect "substantially out-

weigh[s]" its probative value. There is no doubt that the evidence had a capacity to prejudice the defense. Yet the trial judge's on-the-scene judgment is entitled to respect and will be overturned only if an abuse of discretion. *United States v. Tse,* 375 F.3d 148, 155 (1st Cir.2004).

Here the district court gave consideration to the issue in a pre-trial hearing and gave the usual limiting instruction to the jury not to misuse the testimony. We have reviewed the transcript and find that the testimony gave little detail about the episodes beyond what has been summarized above and probably could not have been stripped down further and remained useful. We approached the matter disposed to be critical and have emerged agnostic. There was no abuse of discretion.

Pagán's next claim of error involves the exclusion of evidence. A few months before the FBI interview recounted above, Pagán had a telephone conversation with one Margarita Pagán (no relation of defendant) about the government's investigation of possible obstruction of justice during the Kourí trial. The FBI had instigated Margarita Pagán's call, and she had given the FBI permission to record it. In this call, Pagán made a series of self-exculpatory statements about his involvement with pertinent events.

■■■ At trial, Pagán sought to play the tape, arguing that it fell within the public record or residual exceptions to the hearsay rule or could be used as some form of impeachment evidence. The district judge disallowed the tape. We review *de novo* the district court's reading of the Federal Rules of Evidence; but the judge's application of the residual hearsay exception—which depends on judgment calls—is reviewed for abuse of discretion only. *United States v. Sposito,* 106 F.3d 1042, 1046 (1st Cir.1997).

■■■ The public record exception, Fed. R.Evid. 803(8)—no model of lucid drafting—contains a subsection relied on by Pagán that permits the admission of "[p]ublic records and reports" offered "against the Government in criminal cases" where the record or report "set[s] forth ... factual findings resulting from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C). This exception is inapplicable here because, as the district court properly held, Pagán's self-exculpatory statements are not government "factual findings" at all. *United States v. Mackey,* 117 F.3d 24, 28–29 (1st Cir.) ("[H]earsay statements by third persons ... are not admissible under [Rule 803(8)(C)] merely because they appear within public records."), *cert. denied,* 522 U.S. 975, 118 S.Ct. 431, 139 L.Ed.2d 331 (1997).

■■■ The residual exception, Fed. R.Evid. 807, permits the court to admit a hearsay statement, not made admissible by some explicit exception, which has "equivalent circumstantial guarantees of trustworthiness." The district court reasonably deemed the statements to be untrustworthy. The person to whom Pagán made the statements was someone to whom he would have had no interest in making admissions and there was some reason to think that Pagán suspected that his statements were being recorded.

Nor do Pagán's statements on the tape qualify as impeachment in the sense he argued at trial. They did not impeach the FBI agent who testified as to the conference with Pagán. Pagán had already elicited from the agent on cross examination that Pagán's statements during the telephone conversation were exculpatory. The tape would have supported the agent's testimony rather than contradicted or undercut it.

■ On appeal, Pagán argues for the first time that his taped conversation was admissible under Fed.R.Evid. 806 to impeach Pagán's own admissions during the later interview with prosecutors and the FBI. That rule allows a declarant (which, as to his admissions at the FBI interview, includes Pagán, *see United States v. Shay,* 57 F.3d 126, 132 (1st Cir.1995)) to be impeached by evidence that could have been offered had the declarant testified live. A prior inconsistent statement is a standard form of impeachment noted in Rule 806 itself.

Whether prior exculpatory denials of guilt really "attack[ ]" the "credibility" of a later confession is an interesting issue which might well turn upon the circumstances. In all events, this ground of admission was not preserved for the appeal, *see* Fed.R.Evid. 103(a)(2), and there was certainly no plain error in excluding the tape. As we noted above, the jury had already been told by a government witness, albeit without detail, that Pagán had made exculpatory statements on the tape.

■ Pagán next claims that the government violated his due process rights by obtaining his conviction "through use of false evidence, known to be such by representatives" of the government. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). He first faults the government for eliciting testimony from Kourí, called as a government witness at Pagán's trial, that Kourí had been jailed in Cuba as a political prisoner and served as the only doctor to many fellow political prisoners. At Kourí's own trial the government had said that Kourí had been jailed in Cuba for stealing funds.

The circumstances are peculiar. Pagán, cross-examining a government witness—the prosecutor at the Kourí trial—had brought out the fact that that prosecutor had in a bench conference at the Kourí trial suggested that Kourí had been a thief rather than a political prisoner. The government, implying that it does not really know which version was correct, now says that in Pagán's trial it was entitled to get on the record immediately Kourí's own version contradicting the charge of theft already brought out by the defense.

There is always reason for scrutiny when the government may appear to be sponsoring at different times two different versions of events. However, the government's main obligation, clearly established by the case law, is that it never present evidence knowing it to be false. *E.g., United States v. Pandozzi,* 878 F.2d 1526, 1532 (1st Cir.1989). There is no indication on the present facts that the government's eliciting of the political prisoner story involved the knowing use of false testimony.

■ Nor could we say, as *Napue* requires, *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that the allegedly false testimony likely affected the outcome. The cause of Kourí's jailing in Cuba—whether as thief or political martyr—was only marginally relevant to his credibility—which was already severely impaired by his own federal-court conviction. And any portions of Kourí's testimony against Pagán worthy of dispute were only one strand in the testimony supporting Pagán's conviction.

■ A similar claim by Pagán is based on two alleged inconsistencies between Ramírez' grand jury testimony and his testimony at trial. One was minor; the other may not have been a contradiction at all; and in any case merely to point to inconsistencies between two versions of a witness' testimony does not show that the government, in presenting the later version, was presenting false testimony, let alone testimony known to be false. *Pandozzi,* 878 F.2d at 1532.

This brings us to Pagán's dual claim that, with respect to the perjury count, the evidence was insufficient and the court erred in its instructions. In this count, Pagán was charged with lying during the Kourí trial by testifying that (1) the suggestion that Pagán contact Ornelas in 1992 came from a San Juan AIDS Institute official; (2) he had seen certain AIDS educational materials at Ornelas' office in Mexico in 1992; and (3) he had never (prior to his testimony) seen certain contracts—which turned out to have been sham documents—between Panamericana and the San Juan AIDS Institute.

A statement under oath constitutes perjury if it is false, known to be so and material to the proceeding. 18 U.S.C. § 1623. As to the first two statements, Pagán on appeal contests the elements of knowing falsity, and as to the third, the materiality element as well. The question in this sort of sufficiency-of-evidence challenge is whether the evidence permitted a reasonable jury to find one or more of the three alleged perjuries proved beyond a reasonable doubt. *Cf. Brache v. United States,* 165 F.3d 99, 102 n. 3 (1st Cir.1999) (citing *Griffin v. United States,* 502 U.S. 46, 50, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)).

Beginning with the first statement, testimony that the jury could choose to believe showed that Pagán had admitted at the meeting with the FBI and prosecutors that he had lied at the earlier trial in testifying that the San Juan AIDS Institute official had directed him to Ornelas. Pagán points to evidence helpful to him (*e.g.,* that the testifying FBI agent had not recorded the statement in his notes), but this was for the jury to evaluate.

As to the second statement, Pagán admitted in the same meeting with the FBI that he had first seen the materials in question in 1993 in Berlin and had not been to Ornelas' office until much later, and he could not explain why he had several times said at the Kourí trial that he had seen the materials in 1992 in Mexico. On appeal, Pagán says that he was arguably just mistaken as to date and place, but the inference as to deliberate falsity or mistake was for the jury.

Concerning the third statement, Pagán also admitted to the FBI that he had seen the backdated contracts prior to the Kourí trial and that his contrary trial testimony was a lie. Pagán explained that he thought the issue unimportant, but the materiality test is objective. *United States v. Finucan,* 708 F.2d 838, 848 (1st Cir.1983) (whether testimony "capable of influencing the tribunal"). Here, Pagán's false testimony shielded the fact that he had seen the contracts the month before his testimony while traveling to Mexico at Kourí's request.

Pagán's objection to the instructions is more serious. He says that the court should have told the jury that all jurors had to agree unanimously, as to at least one of the three statements, that it was knowingly false and material. Pagán's concern is that some jurors might think statement A was perjurious and some might think that of B, but the jurors might not unanimously agree that any single statement was perjurious.

The government, as it did here, sometimes charges multiple perjuries under a single count.[2] One might think either that this renders the count duplicitous, or at

---

2. *See, e.g., United States v. Bonacorsa,* 528 F.2d 1218, 1221–22 (2d Cir.) (citing Fed. R.Crim.P. 7(c)), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); *United*

States v. Edmondson, 410 F.2d 670, 674 n. 6 (5th Cir.), *cert. denied,* 396 U.S. 966, 90 S.Ct. 444, 24 L.Ed.2d 430 (1969).

least that the jury would have to be told that all jurors must agree that one specific perjury had been proved. At least two courts of appeals have required a "specific unanimity" instruction along the lines of the latter suggestion when a defendant requested it at trial. *See United States v. Fawley,* 137 F.3d 458, 470–72 (7th Cir. 1998); *United States v. Holley,* 942 F.2d 916, 925–29 (5th Cir.1991).

Nevertheless, the law is less clear than it might be as to when juror unanimity is required in the face of alternative paths to a verdict. *See Richardson v. United States,* 526 U.S. 813, 817–24, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999); *Schad v. Arizona,* 501 U.S. 624, 630–45, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion); *United States v. Verrecchia,* 196 F.3d 294, 297–301 (1st Cir.1999). Within a single count there may be alternative theories, alternative factual scenarios, and alternative lines of evidentiary inference, making generalizations about unanimity hazardous.

In this case, Pagán concededly did not seek a unanimity instruction in the district court and we do not find plain error. *See United States v. Gomez,* 255 F.3d 31, 37 (1st Cir.2001). The evidence was adequate (even if not overwhelming) as to the perjurious character of all three statements; and Pagán cannot show that omitting the instruction probably changed the result nor is there anything close to a miscarriage of justice. *United States v. Olano,* 507 U.S. 725, 736–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

▆▆▆ Pagán did request at trial a "missing witness" instruction, asking that the court tell the jury "that the absence of Ms. Ornelas may justify an inference that

her testimony would be unfavorable [to the government]." Such an instruction may be given where a party controls or has peculiar access to a witness and, in the circumstances, it may be reasonable to suppose that the party would produce the witness unless the testimony was unfavorable. *United States v. Lewis,* 40 F.3d 1325, 1336 (1st Cir.1994).

▆▆▆ Whether the circumstances warrant the instruction is usually a judgment call reviewed for abuse of discretion. *Lewis,* 40 F.3d at 1336. No abuse occurred here. Ornelas, a Mexican national, had testified at Kouri's trial as part of a deal sparing her from federal prosecution. There was no reason to believe that, three years later, the government had any special access to or leverage over this witness. There is no indication that Pagán even attempted to call Ornelas to testify, further undermining the requested instruction. *See United States v. DeLuca,* 137 F.3d 24, 38 (1st Cir.), *cert. denied,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998).

Finally, in his opening brief Pagán sought to challenge his sentence in light of the Supreme Court's *Blakely v. Washington* decision, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). By the time he filed his reply brief, Pagán had completed serving his incarceration,[3] and so he has withdrawn his sentencing challenge as moot. We therefore do not reach it.

*Affirmed.*

---

**3.** So far as we can tell from the docket, the delay in Pagán's appeal was largely caused by delay in the appeal of a co-defendant. Pagán did eventually move to unconsolidate the appeals, but it appears he did not file his motion until he had completed his 18–month sentence.