# United States Court of Appeals
## For the First Circuit

No. 05-2419

MARK OBERSHAW,

Petitioner, Appellant,

v.

KATHLEEN LANMAN; PETER ALLEN,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Lynch, and Howard,
Circuit Judges.

Donald A. Harwood for appellant.
Daniel I. Smulow, Assistant Attorney General, Criminal Bureau,
with whom Thomas F. Reilly, Attorney General, was on brief, for
appellees.

June 30, 2006

**LYNCH**, **Circuit Judge**. Mark Obershaw ("Obershaw") was convicted in Massachusetts state court of the first-degree murder of his brother by extreme atrocity or cruelty. His conviction was affirmed by the Massachusetts Supreme Judicial Court (SJC), see Commonwealth v. Obershaw, 762 N.E.2d 276 (Mass. 2002), and his subsequent petition for a writ of habeas corpus in the federal district court was denied. He appeals from that denial, arguing that his conviction is unconstitutional because the jury was not instructed that it must be unanimous as to which particular factors supporting the "extreme atrocity or cruelty" determination were present. He also argues that the police obtained incriminating statements from him in violation of his rights to remain silent and to counsel, and that the prosecution made various remarks during closing argument that were so improper as to amount to a violation of due process. We reject all these arguments and affirm.

I.

We summarize the facts as found by the SJC, using the record to supplement some points. See Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006).

Obershaw lived in a townhouse in Rockland belonging to his brother, Brian. In July of 1997, frustrated with Obershaw's gambling problem, Brian packed up Obershaw's possessions and, when Obershaw returned from a trip, asked Obershaw to leave. Obershaw, 762 N.E.2d at 281. Obershaw, in a rage, killed his brother Brian

-2-

by hitting him on the head with "the Club," a steel device for locking the steering wheel of a car. Obershaw, after attempting to clean up the scene of his crime at the house, put Brian's body and some bloody items in the trunk of his car. He buried Brian's body in a landfill in Bedford, discarding his own bloody clothes and the Club along the way. Id.

The police were called to the house on the evening of July 25, found certain areas covered in blood, and noticed that a portion of carpeting, the shower curtain, and other items were missing. Id. A neighbor had seen a car like Obershaw's at the house that morning, and the police broadcast a description of the car. Id. at 281-82.

At roughly 3:00 a.m. on July 26, a Nahant police officer saw Obershaw and his two dogs sleeping in his car by the side of the road. Id. The officer told Obershaw that he could not sleep there and suggested that he move his car to a nearby parking lot located behind the police station and other municipal buildings. Obershaw drove to that lot and went back to sleep. Id. The Nahant police checked Obershaw's license plate and learned that he was wanted for questioning in a homicide case (Brian's). They contacted the state police and blocked the parking lot's exits. When the state police arrived, Obershaw was asleep. Id.

The police woke Obershaw, asked him to step out of the car, advised him of his rights under Miranda v. Arizona, 384 U.S.

-3-

436 (1966), and told him they were looking for Brian. Obershaw, 762 N.E.2d at 282. Obershaw asked what the problem was, said that he did not know where Brian was, and told the police repeatedly that he loved Brian. Id. He "agreed to accompany the police to the station, and offered to 'voluntarily stay and cooperate' in the search." Id.

The police told Obershaw he was free to leave, and they allowed him to spend a great deal of time alone with his dogs. Id. He voluntarily cooperated with the police, consenting to a search of his car, trunk, and suitcase. He also agreed to have his hands swabbed for blood and fingerprints. Id. After obtaining a written Miranda waiver, the police asked Obershaw where he had been on the 25th. Obershaw said he had returned to Brian's house from a trip to Atlantic City, entering at 6:00 a.m. and leaving shortly thereafter without seeing or speaking to Brian. Id. Obershaw "volunteered to submit to a polygraph test and cooperate fully." Id.

When this conversation ended, Obershaw stayed at the station, although he was told again that he was free to leave. Id. For the next few hours, while the police inspected his car with his consent, he played with his dogs near the station, "not accompanied by a police escort or restrained in any way." Id. Some stains in the trunk tested positive for blood. The police stopped their consent search and decided to seize the car and obtain a warrant to

-4-

search it; they so informed Obershaw.  Obershaw, after spending some time with his dogs, "indicated that he wanted to talk." Id. He started crying and told the police, "I love my brother.  It was my fault.  I'm sorry.  I hit him."[1]  Id.

Obershaw asked for some time.  After ten or fifteen minutes, the police asked him whether he would take them to Brian's body.  Obershaw asked, "Can I talk to a lawyer first?" Id. at 284. The police told him that he could use the telephone to call a lawyer, but Obershaw declined, saying that he did not want to call a lawyer, and that he wanted instead to spend some time outside with his dogs.  Id.  The police allowed this, keeping Obershaw under guard.  Id. at 282.  After a short while, Obershaw "approached [an officer] outside the station and initiated a conversation."  Id. at 284.  That officer again told Obershaw he could use the telephone if he wanted a lawyer.  Id.  Obershaw again declined and decided to spend another half hour with his dogs.

Obershaw then told one of the officers that "this wasn't premeditated" and that he "didn't plan it."  The police asked where Brian's body was; Obershaw agreed to lead police to the body.  Id. at 283.  He also told the police that Brian became upset with him for being in the house.  Brian started to push him out and hit him lightly in the head, hurting him only emotionally; Obershaw said he

_____

[1] Starting then, Obershaw was not free to leave, and the police considered him to be in custody, although they did not handcuff him.  Id.

-5-

then took up the Club and began hitting Brian with it, ultimately chasing Brian upstairs, where he continued to hit him.  Id.

Obershaw accompanied the police to the landfill and directed them to Brian's body.  Id.  After being advised again of his Miranda rights, he went on to tell police that he had thrown the Club along a particular road and had put some other items behind a certain school, and he provided further details about the homicide itself and what he did in the immediate aftermath.  Id.

Obershaw took the stand at trial.  He testified that Brian "was the aggressor the whole time" -- that Brian was the one who picked up the Club and chased him (Obershaw) upstairs, and that after a struggle, he hit Brian just once with the Club before hitting his own head against the wall and blacking out.  Id. at 286.  This testimony was contradicted by the story Obershaw had earlier told to the police, which was admitted into evidence through police testimony after Obershaw's motion to suppress was denied.  Id. at 280.  There was also evidence, including more than eighty photographs, that Brian received "at least ten blows to the head," "did not die immediately from the first blow," and suffered defensive injuries to his hands.  Id. at 286.  The jury convicted Obershaw of murder committed with extreme atrocity or cruelty -- that is, first-degree murder.  Id. at 280.  The SJC affirmed.  Id. at 290.

Obershaw then filed a federal petition for habeas corpus. The district court denied the petition, but granted an amended certificate of appealability as to the following issues:

> 1. Whether petitioner's rights under the 4th and 5th Amendment[s] were violated by the admission into evidence of his statements.
> 2. Whether petitioner's rights under the 5th Amendment were violated . . . by the prosecution's closing argument. . . .
> [3]. Whether petitioner's 5th and 6th Amendment rights were violated by the refusal by the trial court to instruct the jury that it had to be unanimous in deciding the factors concerning extreme atrocity.

Of these, the third is the most significant issue.

## II.

We review de novo the district court's denial of habeas relief. Lynch, 438 F.3d at 44.

The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, provides for deferential review as to any federal claim that was "adjudicated on the merits in State court proceedings": habeas relief is unavailable on such a claim unless the state court's adjudication of the claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

However, we review de novo any federal claim that was "raised before the state court but was left unresolved." Lynch, 438 F.3d at 44 (internal quotation marks omitted) (quoting Horton v. Allen, 370 F.3d 75, 80 (1st Cir. 2004)). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Finally, we cannot reach the merits of the federal claim at all if it was procedurally defaulted at trial, unless the default is excused. Lynch, 438 F.3d at 44.

A.    Jury Instructions

Obershaw's primary challenge is to the jury instructions as to unanimity on the first-degree murder charge. In Massachusetts, "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree." Mass. Gen. Laws ch. 265, § 1. Further, "[m]urder which does not appear to be in the first degree is murder in the second degree," and "[t]he degree of murder shall be found by the jury." Id.

In Commonwealth v. Cunneen, 449 N.E.2d 658 (Mass. 1983), the SJC listed seven "factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty." Id. at 665. These factors, the SJC said, "include indifference to

or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed."  Id.

Over Obershaw's objection, the trial court refused to instruct the jury that it must be unanimous as to which specific Cunneen factors justified a verdict of first-degree murder by extreme atrocity or cruelty.  Obershaw, 762 N.E.2d at 289. Obershaw's arguments under federal law, described below, were preserved and adjudicated on the merits.  See id. at 290 & n.5. Thus, the deferential AEDPA standard of review applies.

Obershaw's first argument is that a jury determination that one or more the Cunneen factors is present results "in an enhanced verdict of first-degree murder, and thus, more harsh sentencing consequences," in violation of the rule articulated in Apprendi v. New Jersey, 530 U.S. 466 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," id. at 490.  He argues that the sentenced is "enhanced" in the sense that those convicted of first-degree murder receive a mandatory life sentence without the possibility of parole, whereas those convicted of

second-degree murder receive a mandatory life sentence which includes the possibility of parole after fifteen years.

Obershaw is correct that there is a parole-eligibility differential. See Mass. Gen. Laws ch. 127, § 133A; id. ch. 265, § 2; Commonwealth v. Glass, 519 N.E.2d 1311, 1316 (Mass. 1988). He is mistaken, however, to view this case as presenting an Apprendi problem. When the jury finds that one or more of the Cunneen factors was present and therefore that the murder was committed with extreme atrocity or cruelty (and therefore that the murder was in the first degree), there is no increase in the prescribed statutory maximum penalty. The maximum penalty for both first- and second-degree murder is life in prison, and indeed, a life sentence is mandatory for both degrees of murder.[2] See Mass. Gen. Laws ch. 265, § 2 (providing for mandatory penalty of "imprisonment in the state prison for life" for both first- and second-degree murder). Thus, no Apprendi problem is presented.

In any event, even if the Supreme Court might arguably extend the Apprendi holding to this sort of situation, where actual time in prison is potentially increased within a statutory maximum through the mandatory denial of parole, it has not done so yet.

---

[2] The Massachusetts murder statute still provides that the death penalty is available for first-degree murder committed with extreme atrocity or cruelty, see Mass. Gen. Laws ch. 265, § 2, but the SJC has ruled that the death penalty violates a provision of the state constitution, see Dist. Attorney for Suffolk Dist. v. Watson, 411 N.E.2d 1274, 1275 (Mass. 1980).

-10-

Cf. United States v. Booker, 543 U.S. 220, 244 (2005) (describing the "holding in Apprendi" as requiring that "[a]ny fact . . . which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict . . . be admitted by the defendant or proved to a jury beyond a reasonable doubt" (emphasis added)).  Thus, the SJC's decision that there was no Apprendi problem was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

Obershaw's next argument is that, Apprendi aside, jury unanimity, as a matter of federal due process, is required as to identifying which particular Cunneen factors are present, because those factors are "elements" of the crime of first-degree murder by extreme atrocity or cruelty.  Obershaw's argument rests on his constitutional right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  Apprendi, 530 U.S. at 477 (internal quotation marks omitted) (alteration in original) (quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)).  Obershaw invokes Richardson v. United States, 526 U.S. 813 (1999), in which the Supreme Court stated that it "has indicated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that

-11-

definition risks serious unfairness and lacks support in history or tradition."[3]  Id. at 820.

Obershaw's argument that the Cunneen factors are "elements" relies, in part, on his view that because the Cunneen factors consist of "broad and non-specific categories of proscribed conduct sounding in the nature of elements," as opposed to particular means of accomplishing a single element, they meet the definitional requirement for "elements," as a matter of federal law, under a test he says was established in Richardson.  Obershaw also stresses that the SJC has made it a mandatory prerequisite for a first-degree murder conviction on the theory of extreme atrocity or cruelty that the jury find at least one of the Cunneen factors to be present.  As Obershaw notes, the SJC has held that "the judge should delineate the [Cunneen] factors for the jurors' consideration and inform the jurors that they must base their

_____

[3] In Richardson, the Court noted that it "has not held that the Constitution imposes a jury unanimity requirement" for state criminal cases.  526 U.S. at 821; see also Schad v. Arizona, 501 U.S. 624, 630-31 (1991) (plurality opinion) (declining to hold "that the Sixth, Eighth, and Fourteenth Amendments require a unanimous jury in state capital cases"); Johnson v. Louisiana, 406 U.S. 356 (1972) (unanimous jury not required in state noncapital cases).  This does not necessarily mean Obershaw has no constitutional claim, for the question of how much leeway a state has in defining crimes still remains.  Schad, 501 U.S. at 630-31. This case deals only with that issue -- the scope of facts on which the requisite number of jurors had to agree, not the particular number of jurors who had to be in agreement -- and our references to "unanimity" should be read accordingly.  (Here, the Commonwealth did require all twelve jurors to agree on the verdict.)

verdict of guilty of murder by extreme atrocity or cruelty on evidence of at least one of the delineated considerations." Commonwealth v. Semedo, 665 N.E.2d 638, 646 (Mass. 1996); see also Commonwealth v. Dahl, 724 N.E.2d 300, 309 (Mass. 2000) ("[A] jury must find the presence of at least one of the Cunneen factors before [it] can find that a homicide has been committed with extreme atrocity or cruelty[,] and . . . language suggesting other factors as determined by the jury [is] improper."); Commonwealth v. Hunter, 695 N.E.2d 653, 658 (Mass. 1998) (judge did not err in telling jurors that they must consider all of the Cunneen factors and in refusing to withdraw two factors from their consideration).

The SJC has, however, made clear that as a matter of state law, the Cunneen factors are only evidentiary considerations, not elements. It so held in rejecting the claim that the judge must instruct the jurors that they are "required to agree unanimously on which of the Cunneen factors provided the basis for their verdict." Hunter, 695 N.E.2d at 658. Explaining why jury unanimity as to specific Cunneen factors is not required, the SJC clarified that the factors are simply "'evidentiary considerations' that guide the jury in determining whether a murder was committed with extreme atrocity or cruelty." Id. That reasoning was at the heart of the SJC's analysis in this case. Obershaw, 762 N.E.2d at 290 & n.5. Given the SJC's interpretation of state law, we are not

-13-

free to reinterpret the status of the <u>Cunneen</u> factors on our own.[4]
<u>Cf.</u> <u>Schad</u> v. <u>Arizona</u>, 501 U.S. 624, 636-37 (1991) (plurality
opinion) (noting that "we simply are not at liberty to ignore [the
state courts'] determination and conclude that the alternatives
are, in fact, independent elements under state law," and that the
only issue was whether the state's choice was constitutional).

Obershaw argues that the state court's labeling of the
<u>Cunneen</u> factors as mere evidentiary considerations and not as
elements is not conclusive.  He argues essentially that as a matter
of federal law, regardless of the state law label, if it walks like
a duck and quacks like a duck, it is a duck.  He cites <u>Ring</u> v.
<u>Arizona</u>, 536 U.S. 584 (2002), and in particular, its language that
"[i]f a State makes an increase in a defendant's authorized
punishment contingent on the finding of a fact, that fact -- no
matter how the State labels it -- must be found by a jury beyond a
reasonable doubt," <u>id.</u> at 602.

We agree that state law labels for what is an element and
what is not are not always determinative for purposes of the
constitutional inquiry.  <u>See</u> <u>id.</u> at 604-05 (noting that <u>Apprendi</u>,
in the context of "elevation of the maximum punishment, . . .
instructs . . . that the characterization of a fact or circumstance

---

[4] The SJC's interpretation of state law precludes this court
from treating the question of interpretation as an open one, and
thus precludes application of the rule of lenity or of
constitutional avoidance, as urged by Obershaw.

as an 'element' or a 'sentencing factor' is not determinative of the question 'who decides,' judge or jury"). And one can imagine a situation in which, under Ring, a state's definition of something as not an element of a crime, but merely an evidentiary consideration, would be unconstitutional if it infringed on the right to a jury finding of a certain fact. But this is not such a case. Further, the SJC was not unreasonable in thinking this was not such a case.

We have several reasons for our conclusion. First, the maximum sentence authorized under the murder statute -- with or without a jury finding of first-degree murder by extreme atrocity or cruelty -- was the same (life imprisonment), and therefore Ring is inapposite. Further, in Schad, the Supreme Court rejected the argument that the Constitution requires the jury to be instructed that it must be unanimous as to the theory of first-degree murder (premeditation or felony murder) before it may render a verdict of first-degree murder. See 501 U.S. at 627. This suggests that Massachusetts, although it may choose as a matter of state law to require unanimity as to which theory of first-degree murder was proven, see Commonwealth v. Berry, 648 N.E.2d 732, 742 (Mass. 1995), has significant leeway under the Constitution to choose not to require unanimity as to specific sub-determinations supporting the ultimate conclusion on a particular theory. Cf. Kansas v. Marsh, No. 04-1170, slip op. at 10, -- U.S. --, 2006 U.S. LEXIS

-15-

5163, *20 (U.S. June 26, 2006) ("So long as a state system satisfies [certain] requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed.").

Obershaw misreads Richardson. Richardson does not set up a due process standard for what is an element and what is not. Obershaw is simply wrong to say that anything which is a "broad and non-specific categor[y] of proscribed conduct sounding in the nature of [an] element" is an element. Richardson involved only interpretation of a federal statute, it did not use the language Obershaw suggests as a test, and to the extent it relied on such a concept, it was only in attempting to ascertain congressional intent as to what was an element. Richardson did not evaluate the constitutionality of a state statute as interpreted by a state court as to what was an element. Rather, Richardson works against Obershaw's argument. It noted that the jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." 526 U.S. at 817. Obershaw's case fits into this latter category.

This court has recently observed that "the law is less clear than it might be as to when juror unanimity is required in

-16-

the face of alternative paths to a verdict," and that "[w]ithin a single count there may be alternative theories, alternative factual scenarios, and alternative lines of evidentiary inference, making generalizations about unanimity hazardous."  United States v. Pagán-Santini, -- F.3d --, No. 03-2574, 2006 U.S. App. LEXIS 14627, at *19-20 (1st Cir. June 14, 2006); see also id. at *16-20 (holding that defendant charged with one count of perjury based on three separate statements had not shown plain error in court's failure to instruct jurors that they must unanimously agree on which specific statements were perjurious).  We have also noted that "[w]hether a particular fact is a means or an element is a 'value choice[] more appropriately made in the first instance by a legislature than by a court.'"  United States v. Verrecchia, 196 F.3d 294, 299 (1st Cir. 1999) (quoting Schad, 501 U.S. at 637 (plurality opinion)); see also id. at 301 (holding that "Congress did not intend the possession of a particular firearm to be an element of [the crime of possession of 'any firearm' by a felon]," so that district court did not err in "fail[ing] to give an instruction requiring jury unanimity on any particular firearm").

In sum, the SJC has determined that the Cunneen factors are simply evidentiary considerations on the ultimate question of extreme atrocity or cruelty, not elements, and we cannot say that the choice not to require jury unanimity as to specific factors is

contrary to, or involves an unreasonable application of, clearly established federal law.

B.         Statements to the Police

Obershaw moved to suppress his statements to the police, partly on the ground he raises here: that he requested a lawyer, and that instead of honoring that request, the police elicited statements from him without a valid waiver of his rights. Obershaw, 762 N.E.2d at 280. This claim was presented to the state courts in federal constitutional terms, and adjudicated in such terms. See id. at 281, 283-84. The deferential AEDPA standard of review applies. We first describe the federal law.

Once a suspect invokes his right to have counsel present during custodial interrogation, the fact that he responds to later interrogation by the police does not, in itself, establish that he validly waived that right. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). In fact, once a suspect "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id.

In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court held that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an

-18-

attorney." Id. at 461. "[T]he suspect must unambiguously request counsel," and "if [he] makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that [he] might be invoking the right to counsel," police questioning need not cease. Id. at 459. The test is an objective one: whether the suspect has "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id.

Obershaw does not take issue with his initial statements to the police. He was advised of his Miranda rights at the outset, and he willingly conversed and cooperated with the police, even signing a written Miranda waiver. Eventually, though, the police discovered blood, and Obershaw made a brief, tearful confession. It was shortly after that statement, when the police asked Obershaw whether he would show them where Brian's body was, that Obershaw asked, "Can I talk to a lawyer first?" Obershaw's argument is that this was a clear, unambiguous request for counsel, and that the statements he gave to the police after that request were improperly obtained and should have been suppressed.

The state trial court determined that Obershaw "never adequately and affirmatively invoked his right to counsel." Obershaw, 762 N.E.2d at 283 (internal quotation marks omitted). The SJC, citing Davis, inter alia, agreed. Id. at 283-84. The SJC

-19-

stressed that the police responded to Obershaw's question by telling him he could use the telephone to call a lawyer, that he declined, that it was Obershaw who later initiated a conversation with the police, that he was again invited to use the telephone to call a lawyer, and that he again declined, after which he spent half an hour with his dogs and then started speaking to the police again. Id. at 284. The SJC reasoned that in this context, Obershaw had not clearly and affirmatively requested an attorney. Id.

Under AEDPA, this court is limited to determining whether the SJC reached a decision contrary to, or involving an unreasonable application of, clearly established federal law, or one based on an unreasonable determination of the facts in light of the evidence.[5] The SJC's decision falls into neither category.

Obershaw inquired whether he could talk to a lawyer, rather than expressly asserting that he in fact wanted to do so. He has not directed us to any precedent, Supreme Court or otherwise, holding that language like his meets the Davis standard of unambiguously requesting counsel by expressing, with sufficient

---

[5] Respondents argue that whether Obershaw adequately requested an attorney is a factual determination which, under 28 U.S.C. § 2254(e)(1), must be presumed correct, and which Obershaw can only rebut by clear and convincing evidence. Respondents point to Sanna v. DiPaolo, 265 F.3d 1, 10 (1st Cir. 2001), but the challenge there was only to the state courts' credibility-based determination of a historical fact. The question here is not what the basic facts are, but what their legal import is.

clarity, a desire to have counsel present.  Moreover, even if Obershaw did initially invoke his right to counsel by asking whether he had such a right, he subsequently became subject to further police questioning when, despite twice being invited to call a lawyer, he chose to initiate further conversation with the police.  See Edwards, 451 U.S. at 484-85.

C.        Prosecution's Summation

Obershaw's final claim is that "the prosecutor's summation was grossly improper, thereby rendering the resulting conviction a denial of due process."[6]  He relies on Darden v. Wainwright, 477 U.S. 168 (1986).  There, the Supreme Court held that certain comments made by the prosecution during closing argument "undoubtedly were improper."  Id. at 180.  Even so, the Court held, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Id. at 181 (some internal quotation marks and citations omitted) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).

We begin with those remarks to which Obershaw objected at trial.[7]  The SJC reviewed these objected-to comments "to determine

_____

[6] Obershaw argued to the SJC that the prosecutor's summation "violated . . . federal due process of law."

[7] Obershaw raised some objections during the prosecution's summation, and some immediately after.  With one exception noted in

-21-

whether there were improprieties, and if so, whether they were harmless."  Obershaw, 762 N.E.2d at 287.  There is a question, not briefed by the parties, as to whether the SJC applied a standard at least as favorable to Obershaw as the federal standard, in which case the deferential AEDPA standard of review would apply, or not, in which case we would review Obershaw's claim de novo.[8]  See Ouber v. Guarino, 293 F.3d 19, 31-32 & n.8 (1st Cir. 2002).  Obershaw assumes that de novo review is proper here, while respondents assume that the deferential AEDPA standard of review applies.  It is unnecessary here to resolve the issue, because we would reach the same conclusion under either standard of review: the prosecutor's comments do not form a basis for habeas relief.

First, the prosecutor said, "I suggest to you in no uncertain terms" that Obershaw "lied to you" and to the police.  In a similar vein, the prosecutor later called Obershaw's claim that he did not remember killing Brian "an insult to your intelligence

_____

the text, the SJC treated Obershaw as having preserved each issue for review.  Obershaw, 762 N.E.2d at 287.

[8] The SJC cited Chapman v. California, 386 U.S. 18 (1967), a case involving improper prosecutorial comments which held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," id. at 24.  The SJC also cited Commonwealth v. Dougan, 386 N.E.2d 1 (Mass. 1979), which stated that "[t]he task of this court is to assess on exceptions by the defendants whether the argument as a whole is prejudicial in light of all the circumstances, including the nature of the evidence, the persistence or flagrancy of the remarks, and the instructions of the judge," id. at 6.  The SJC also relied on other state cases.

-22-

. . . as jurors." This theme, that the story Obershaw told the jury was a lie, was reiterated several more times. Obershaw argues that these statements were nothing more than the prosecutor's personal opinion. Not so; it was reasonable to view them as comments based on the evidence. As the SJC noted, there was ample evidence that Obershaw told the jury a story that not only was different from the one he told the police, but also was implausible. Obershaw, 762 N.E.2d at 288-89. The prosecutor was simply urging the jury to draw a particular conclusion from the evidence, and the comment that the apparent lie was "insult[ing]" was, as the SJC observed, "no more than a 'rhetorical flourish,' undoubtedly recognizable to the jury as such." Id. at 289 (quoting Commonwealth v. Hamilton, 686 N.E.2d 975, 981 (Mass. 1997)).

Second, Obershaw claims there was no evidence showing that Brian was struck with the "ten blows" to which the prosecutor referred. But the medical examiner testified that there were "at least ten blows to the head" (in addition to multiple injuries to other parts of the body).

Third, Obershaw notes that the court precluded the Commonwealth's forensic expert from testifying as to what caused several gouge marks on the bathroom wall. Citing that limitation, he challenges the prosecutor's claims that "[the expert] show[ed] you . . . gouge marks," that "he showed you that photograph with the gouges in it," and that the marks showed that "[you] can see

-23-

where this defendant is pounding away on his skull."[9]  The expert had in fact testified about the significance of certain aspects of the photographs.  The prosecutor did not tell the jury that the expert had testified that it was Obershaw's blows with the Club that caused the marks.  That was a reasonable inference supported by other evidence at trial, and the court had told the prosecutor he was free to so argue.

Fourth, Obershaw argues that there was no evidentiary support for the prosecutor's statements that at the time the gouge marks were made, Brian was "alive" and "suffering," and that Brian "was alive throughout the entire beating."  But there was indeed such evidence: Obershaw himself testified that Brian, "very badly hurt," "covered in blood," and making "ugly breathing sounds," died in his arms; further, the medical examiner testified that Brian lived for at least several minutes after the first blow, that he had defensive wounds, that he had brain injuries which required several minutes to develop, and that he sustained bruises to his ankles while still alive -- bruises likely incurred after the beating, given Obershaw's testimony that, believing Brian already dead, he dragged Brian by the ankles down the stairs before putting him in the trunk of his car.

---

[9] The prosecutor was arguing that Brian's head was near the ground when he was struck.

-24-

Fifth, Obershaw argues that the prosecutor improperly stated his personal opinion when he asked whether Obershaw was "indifferent to his brother's suffering" and answered, "You bet he was. Look at what he did: backed him into a corner and beat him as he lay there defenseless. He showed him no mercy, he was indifferent to [Brian's] suffering." The prosecutor was not stating his opinion, but rather urging the jury to draw a reasonable inference from the evidence. As the SJC noted, the "[y]ou bet" language was simply "a colloquial way of emphasizing the defendant's indifference." Id. at 289.

Finally, Obershaw takes issue with the prosecutor's suggestion that Brian "died in agony, . . . begging his brother to stop." Obershaw argues that there was no evidence to support the claim that Brian was "begging" him to stop. The SJC agreed. Id. at 288. It reasoned, however, that the remark had to be evaluated in the context of the entire summation, the jury charge, and all of the trial evidence, and that the "begging" claim "was not central to the case." Id. The SJC also noted that "the judge instructed the jury that the closing arguments of counsel were not evidence," id., and Obershaw concedes as much. We agree with the SJC that in context, the remark, though incorrect, was unlikely to have caused unfair prejudice to Obershaw.

There is one challenge which, although he did not raise it at trial, Obershaw raised on appeal to the SJC and raises again here. Obershaw points to the following passage:

> Now, I'm going to be honest with you, ladies and gentlemen, I don't really give a crap what [Obershaw] went through. I'm here to tell you what his brother Brian went through, and those photographs, all 90 of them, show you what his brother Brian went through. And the testimony tells you what his brother Brian went through, and how his brother Brian died. I suggest to you [that] he died in agony, he died begging his brother to stop, he died with his hands over his head until he was pounded to the point of defenselessness, and . . . this guy just went on swinging that Club.

Obershaw argues that this was an improper appeal to emotion. Because it found that this objection (as distinct from the evidentiary challenge to the "begging" claim) was not made at trial, the SJC reviewed only "to determine whether there has been any error that creates a substantial likelihood of a miscarriage of justice." Id. at 289. The SJC noted that it was improper for the prosecutor to interject his personal opinion to the effect that he did not "really give a crap what [Obershaw] went through." Id. Even so, the SJC reasoned, the argument did not "play[] to the emotions and sympathies of the jury," and in the context of the entire, lengthy closing argument, this one small portion "could not have created a substantial likelihood of a miscarriage of justice." Id.

We cannot review this claim, because "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred." Coleman v. Thompson, 501 U.S. 722, 750 (1991). The default may be excused, and the bar to federal habeas review removed, only in certain circumstances: where "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id.

Where, as here, the state court finds forfeiture because of the defendant's failure to object at trial, the fact that it reviews for a "substantial likelihood of a miscarriage of justice" does not constitute a waiver of the requirement that the defendant timely object. Lynch, 438 F.3d at 45; Horton, 370 F.3d at 81. In sum, there is an independent and adequate state ground for decision here. Obershaw makes no effort to challenge that conclusion by showing cause for the default and prejudice therefrom, or by demonstrating that "failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

                                III.

The judgment of the district court denying the petition for habeas corpus is affirmed.